Filed 8/3/16  In re M.Y. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re M.Y., a Person Coming Under the Juvenile Court Law. | D069412 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. J516220F) |
| Plaintiff and Respondent, | |
| v. | |
| JOSE G., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County,

Felicia Katsarov, Judge.  (Retired judge of the San Diego Sup. Ct.)  Affirmed.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and

Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County

Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

## I.

## INTRODUCTION

Appellant Jose G. appeals from an order terminating his parental rights to his minor son, M.Y. Jose contends that the juvenile court erred by failing to apply the beneficial relationship exception to the termination of his parental rights (see Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i)). We affirm.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *General background*

M.Y. was the sixth child born to Nicole and Jose. Nicole and Jose's parental rights to their five older children had been terminated before M.Y. was born.

The primary issue that led to the Agency's involvement in this case was ongoing domestic violence between the parents. Beginning in 2006, there were repeated allegations of domestic violence. Despite Agency intervention after the birth of each subsequent child, the parents continued to return to each other. In addition, Jose's psychiatric history included more than one Welfare and Institutions Code[1] section 5150 mental health hospitalization, beginning in 2009.

M.Y. was born in 2013. M.Y. was diagnosed with a seizure disorder and was prescribed phenobarbital. Nicole admitted that she had used methamphetamine while pregnant with M.Y.

---

1       Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

When M.Y. was approximately two months old, the Agency learned that Nicole may have given him too much medication. There was also concern that he had abnormal blood levels related to a metabolic problem. M.Y. required a follow-up appointment with a neurologist because there was a possibility that he might suffer developmental delays or mental retardation.

B. *The detention and jurisdictional/dispositional period*

The Agency filed a dependency petition for M.Y. when he was not quite five months old. The Agency alleged that M.Y. was at a substantial risk of future harm due to a history of domestic violence between the parents, including Jose hitting Nicole on several occasions in the preceding four months. The Agency also requested a protective custody order, which the trial court granted, issuing a protective custody warrant on September 19, 2013.

The juvenile court made a prima facie finding on the petition, detained M.Y. in out-of-home care in a confidential licensed foster home, and ordered supervised visitation for Jose.

In the jurisdiction/disposition report, the Agency recommended bypassing reunification services for both parents and set a section 366.26 hearing. The Agency noted that Jose had reported that he had been working in Los Angeles, and was advised by friends to return to San Diego to care for M.Y. because Nicole had been absent for many days. Jose denied Nicole's allegations that he had hit her. Jose also claimed that he never used drugs and that he had no current mental health issues, although he had been

3

diagnosed with schizophrenia in 2004 and had been hospitalized because of this condition in 2007.  Father received counseling, which he reported was helpful.

When the social worker spoke with Nicole, she denied that Jose had engaged in the abuse alleged.  Nicole stated that she said things she did not mean when she ran out of her medication.  Nicole said that she wanted M.Y. returned to her, but indicated that she did not intend to participate in services.

In an addendum report filed November 6, 2013, the Agency changed its recommendation regarding the provision of reunification services to the parents.  Nicole reported that she was taking medication for seizures, anxiety, and to assist with mood stabilization, and that she was under a psychiatrist's care.  She was also attending counseling for domestic violence, as well as participating in an outpatient treatment program for substance abuse.  However, the results of an on-demand drug test showed that Nicole had tested positive for amphetamines.  Jose reported that he had made attempts to contact some of the resources provided by the Agency, but was awaiting return phone calls.  The social worker told Jose to continue trying, and to let the social worker know if he was unable to contact any of the resources within a week.

The social worker attempted to contact both parents about a month after having spoken with them, to follow up on the services and their visits with M.Y., but both parents' telephone numbers had been disconnected.

C.  *The reunification period*

At the six-month review hearing held in May 2014, the Agency recommended that the court terminate services for both parents.  M.Y. was placed in the same foster home where he had been placed when he was detained in September 2013.

Nicole was reported to have been homeless for periods of time, and the Agency was concerned that she appeared to have spent some time living with M.Y.'s paternal grandmother, which is where Jose was also living.  The Agency was concerned that the parents continued to remain in contact with one another, despite the existence of a restraining order prohibiting such contact.  In addition, Nicole had made little progress with the services that she had been provided and had dropped out of her drug treatment program.  Further, Nicole was confrontational with M.Y.'s foster mother.

Jose was in the early stages of his case plan.  He had attended some individual therapy sessions, and claimed (but did not provide confirmation) that he had attended six domestic violence group classes.  Jose did not report being in treatment with a psychiatrist, and did not appear to be taking the medications that had been prescribed to him after his psychiatric hospitalization.

The court terminated Nicole's services at the six-month hearing, but continued Jose's services for an additional six months, noting that Jose had made some substantive progress with his case plan.

M.Y. had been moved to a new foster home a few months prior to the 12-month review hearing.  During the time period between the 6-month review hearing and the 12-month review hearing, Jose did well with his case plan.  He had a stable home and had

5

obtained a job. Jose had undergone a psychiatric evaluation and was determined not to be in need of psychiatric medication.

During this time period, Jose continued to have regular, positive visitation with M.Y. In addition, during this time, Jose had transitioned to having unsupervised visits with M.Y.

At the 12-month review hearing, the court found that Jose had made substantive progress with the provisions of his case plan, and ordered continued reunification services for him.

By the time of the 18-month review hearing in March 2015, however, the Agency was recommending termination of Jose's parental rights. Jose had been arrested on December 31, 2014, following a domestic violence incident involving Nicole. Nicole reported that she had gone to Jose's home to pick up some of her belongings, and Jose attempted to break her cell phone and hung up the phone as she was calling 911. Jose provided a different version of what occurred, and contended that Nicole had come to his house, confronting him and blaming him for their loss of custody of M.Y. Jose noted that although he had been arrested, the charges had been dropped, and he indicated that he was planning to seek a restraining order against Nicole.

Plans to allow Jose to have overnight visits with M.Y. were placed on hold after Jose's arrest. In late February 2015, police detained Jose on another section 5150 hold, after Jose had expressed suicidal ideation, including during his contact with police officers.

6

Although the social worker reported that Jose was still participating in services and visiting with M.Y. when not affected by his arrest and/or psychiatric hold, the Agency nevertheless recommended that the court set a section 366.26 hearing because it was unlikely that Jose could reunify with M.Y. by the time of the 18-month review hearing, which was set for and held 16 days after the report was filed.

In a report filed on August 17, 2015 for the section 366.26 hearing, the Agency noted that it was working on locating an adoptive placement for M.Y, and was in the process of evaluating a nonrelated extended family member (NREFM) for the placement. That family had previously adopted one of M.Y.'s siblings.

An addendum report filed on October 9, 2015 indicated that Jose had again been arrested on September 10, 2015, after being detained by police as matching the description of a suspect in the area. In the course of the arrest, a police officer determined that there was an outstanding warrant for Jose's arrest. Jose's visitation with M.Y. was suspended as a result of his arrest.

In the meantime, M.Y. had begun visitations with the proposed NREFM caregivers, and the Agency planned to place M.Y. in the home as soon as the home assessment was complete.

The social worker remained concerned about Jose's relationship with Nicole, noting that at the time of Jose's latest arrest, he admitted that he was on his way to see Nicole. The social worker was of the opinion that Jose was like a playmate or friendly visitor to M.Y., and that M.Y. would not suffer significant detriment if his relationship

with Jose were to be severed, given that M.Y. had not seen Jose for approximately a month and continued to thrive.

D. *The section 366.26 hearing*

The trial court held a section 366.26 hearing on December 7, 2015.[2] The court heard testimony from a social worker, and received in evidence a September 1, 2015 section 366.26 report, addendum reports dated October 19 and November 30, 2015, and the resume of the testifying social worker.

The social worker testified that he received M.Y.'s case in June 2015. As of December 4, 2015, there were 33 families available in the county with approved home studies who were willing to adopt a child like M.Y. At the time of the October 19 addendum report, M.Y. had been living with an NREFM. According to the social worker, M.Y. was doing well in the home, and was advancing behaviorally, medically, and emotionally. The social worker believed that the NREFMs' home would be approved for adoption. In addition, the caregivers in the home were committed to adopting M.Y., and that family already had adopted one of M.Y.'s older siblings. The caregivers had also indicated a commitment to fostering M.Y.'s relationships with his biological siblings.

The social worker had observed approximately six or seven visits between Jose and M.Y., the most recent of which had taken place on December 4, 2015. Jose arrived approximately 15 minutes late for that visit, and, according to the social worker, M.Y. did

---

[2]    On this same date, the trial court also held a hearing on a request to modify the court's prior order, a request that Jose had filed the day of the section 366.26 hearing. Jose was requesting that M.Y. be placed in his care. The trial court denied Jose's request to change M.Y.'s placement.

not appear to recognize Jose. The social worker opined that M.Y. did not appear to recognize Jose because he had not seen Jose for a while. The caregiver had to encourage M.Y. to go to Jose, which M.Y. did after approximately 10 minutes. While in the visitation room, Jose provided M.Y. with a snack and the two played. At the conclusion of the visit, M.Y. easily transitioned back to the caregiver.

Based on his observations of visits between Jose and M.Y., the social worker characterized the relationship between the two as one between a child and a friendly visitor. The social worker was also of the opinion that M.Y. would not suffer detriment if his contact with Jose were to end completely. Essentially, the social worker was of the view that a parent-child relationship did not exist between M.Y. and Jose. The social worker believed that M.Y. would receive stability and permanency in the home of his caregivers.

In reaching a decision in this case, the trial court noted the lengthy history between these parents and the Agency. The court stated that "the parents got a gift by even getting services in the first place," and remarked that there was "a very, very long history of domestic violence" in the family. The court also considered the fact that Jose had received 18 months of services, but then "pretty much went back to square one with the 5150."

The trial court concluded that the beneficial relationship exception did not apply in this case. The court noted that although Jose had a very brief period of time in which he had positive visits with M.Y., this brief period of "good visits" simply was not enough to establish that Jose and M.Y. had such a beneficial parent-child relationship that severing

9

that relationship would be sufficiently detrimental to M.Y. as to outweigh the benefit to M.Y. from placement in a permanent adoptive home. The trial court terminated both parents' parental rights.

Jose filed a timely notice of appeal from the trial court's order terminating his parental rights.

III.

DISCUSSION

Jose contends that the trial court erred in declining to apply the beneficial relationship exception to adoption in this case (see § 366.26, subd. (c)(1)(A)). He asserts that his father-son relationship with M.Y. should be preserved, and that this case "call[s] for permanent plans other than adoption."

A. *Legal standards*

If a dependent child is adoptable, the court must terminate parental rights at the section 366.26 hearing unless the parent proves the existence of a statutory exception to adoption. (*Id.*, subd. (c)(1).) An exception exists if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id.*, subd. (c)(1)(B)(i).) "A parent asserting the parental benefit exception has the burden of establishing that exception by a preponderance of the evidence." (*In re J.C.* (2014) 226 Cal.App.4th 503, 529.)

With respect to the visitation prong, "[r]egular visitation exists where the parents visit consistently and to the extent permitted by court orders." (*In re I.R.* (2014) 226

10

Cal.App.4th 201, 212.) The lack of regular visitation "fatally undermine[s] any attempt to find the beneficial parental relationship exception." (*Ibid.*)

This court has interpreted "the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

"We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.)

B. *Analysis*

Although the trial court did not make any specific finding with respect to the first prong of the beneficial relationship exception, even if we assume that Jose maintained consistent visitation and contact with M.Y. sufficient to meet this prong, the trial court concluded that Jose failed to establish the second prong of the exception—i.e., that he

11

had a parent-child relationship with M.Y. that was so beneficial that terminating his parental rights would be detrimental to M.Y. (§ 366.26, subd. (c)(1)(B)(i).) The court noted that M.Y. "had a very, very, very short period of having very good visits with [Jose]," but that this very minor period of good visitation was simply not enough in the context of this child's young life. The court concluded that it could not make a finding that the relationship between M.Y. and Jose was such that the benefits of maintaining that relationship would outweigh the benefits to M.Y. from having a permanent adoptive placement.

The record supports the trial court's determination that Jose did not have a beneficial parental relationship with M.Y. The social worker testified that it was his opinion that there is not a "parent/child relationship between the biological father and [M.Y.]" Other evidence in the record is consistent with the social worker's opinion. M.Y. was removed from Jose's care when he was just five months old. Although Jose had supervised visitation with M.Y. and eventually managed to participate in unsupervised visits, these unsupervised visits lasted for only a brief period— approximately two months. Jose was then arrested as a result of a new domestic violence incident with Mother, and in January 2015, he was placed on a psychiatric hold. Jose's visitation thus returned to supervised visitation, and for a period of time, he was unable to visit with M.Y. at all due to his incarcerations. This limited visitation between Jose and M.Y. necessarily limited the nature and evolution of the relationship between M.Y. and Jose. Further, although M.Y. appeared to enjoy visits with Jose, with no reported issues

12

during the visits, this is not sufficient to demonstrate the existence of such a significant *parental* relationship that its termination would be detrimental to M.Y. The record thus supports the trial court's conclusion that Jose did not truly occupy a parental role in M.Y.'s life.

Further, we conclude that the court did not abuse its discretion in determining that termination of Jose's rights would *not* be detrimental to M.Y. (See *In re Anthony B.*, *supra*, 239 Cal.App.4th at p. 395 [applying abuse of discretion standard to the determination as to whether there is a compelling reason for finding that termination would be detrimental to the child].) The social worker testified that it was his opinion that M.Y. would not suffer detriment if Jose's rights were terminated. This opinion was based in part on the fact that M.Y. had continued to thrive with his caretakers despite having gone through periods of time during which he did not have any visits with Jose. Other evidence supported this opinion, including the fact that M.Y. did not even appear to recognize Jose at one visit and had to be coaxed into engaging with Jose. In addition, M.Y. did not appear in any way distressed at the conclusion of the visit. The court reasonably concluded that M.Y.'s relationship with Jose did not promote M.Y.'s well-being to such a degree as to outweigh the well-being M.Y. would gain from having a permanent adoptive home. (See *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

For these reasons, the juvenile court did not err in concluding that the parental benefit exception to adoption was not applicable in this case.

14

IV.

DISPOSITION

The order of the trial court is affirmed.


AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.

15